UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GRIFFEN SECURITY, LLC, <br><br> *Plaintiff*, <br><br> v. <br><br> BOBBIE THOMPSON, MARKEITH BOYD, SHIRLEY LORRAINE BOYD, *and* CITADEL CAR ALARMS, LLC., <br><br> *Defendants*. | Case No. 1:19-cv-03494 |

**DECLARATION OF GAVIN P. WILDING
IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

I, Gavin P. Wilding, declare under penalty of perjury that:

1. I am chairman and CEO of Griffen Security, LLC ("Griffen"), located at 2255 Glades Road, Suite 324A, Boca Raton, Florida, 33431. Griffen is in the business of developing and selling vehicle security systems. I founded Griffen in 2014 to develop a vehicle immobilizer product designed to stop vehicle thefts.

2. In late 2017, I decided to develop a new vehicle security system product and service. However, before beginning development of this new product, I had a limited patent search conducted to identify patents and prior art relevant to the contemplated vehicle security product. This patent search identified U.S. Patent No. 7,319,378 ("the '378 Patent"), which was then co-owned by Defendants Bobbie Thompson, Markeith Boyd, Shirley Lorraine Boyd ("Individual Defendants"). I since learned that the Individual Defendants assigned the '378 Patent to Defendant Citadel Car Alarms, LLC, managed by Mr. Boyd. The '378 Patent claims elements

1

similar to those envisioned for the new vehicle security system product.

3. I negotiated a non-disclosure agreement with stand still provisions with Mr. Boyd in March of 2018, that was executed March 14, 2018 entitled Confidentiality and Exclusivity Agreement. Griffen conducted a technical assessment of the technology claimed in the '378 Patent, after which I began negotiating a license with Mr. Boyd starting April 16, 2018. During my communications with Mr. Boyd by telephone and email I came to understand that the '378 Patent had issued in 2008 and that owners were unable to get either a product into development or a company to licence patent during the ensuing 10 years. Mr. Boyd expressed to me enthusiasm even gratitude that Griffen was now interested in picking up the patent and running with it to develop a product. Our negotiations were always friendly.

4. After negotiations between myself and Mr. Boyd – in which we were all represented by counsel – we entered into a patent license for the '378 Patent (the "License Agreement"), that became effective with my signature on May 25, 2018. The License Agreement I negotiated with Mr. Boyd grants Griffen an exclusive license to the '378 Patent in exchange for a $10,000 up-front license fee and a five percent (5%) royalty on gross profits of licensed products for the remaining life of the '378 Patent. I paid the up-front licensee fee of $10,000 to Defendant's patent counsel in June 2018.

5. After entering into the License Agreement, I initiated development of a product consistent with the claims of the '378 Patent. The product is now in initial testing. Griffen has contracts and plans in place to begin production in August 2019 to support initiating sales in September 2019.

6. So far Griffen has paid out over $168,000.00 in development costs and contractual arrangements. Griffen has another $42,000 in contractual commitments to finish the

product development.  Griffen will soon incur additional costs as the product enters pre-production testing, manufacturing and sales.

7. On September 26, 2018, I emailed Mr. Boyd that there was a company developing a similar product in the high-end price bracket, and that I made the company aware of the '378 Patent, and the need for acquiring a license if the company brought an otherwise infringing product to market.  Mr. Boyd responded the same day, thanking me for this information.

8. However, beginning the next day on September 27, 2019, Mr. Boyd began sending multiple communications to me, inquiring about the company "infringing our patent."  I responded to Mr. Boyd on October 3, 2019, stating clearly that I had not found the company to be infringing, but rather, only that the company sold a product that, *if upgraded*, *might infringe in the future*.  Mr. Boyd appeared to understand because he responded to me that same day that I had identified a potential infringer that had not yet violated the patent, and thus Griffen was under no obligation to disclose information about the patent owners.

9. In November 2018, Mr. Boyd and I exchanged emails about the status of product development, and Mr. Boyd was appreciative of my updates to him.

10. On December 5, 2018, I received a surprising email from Mr. Boyd, informing me of two entities who Defendants identified as infringers who they were going to pursue for patent infringement.  In response, I informed Mr. Boyd of the identity of the company to whom I had earlier referred in my September 26 email.  In that same response, I provided Mr. Boyd an update on Griffen's product development efforts.  Mr. Boyd sent me a reply the same day, identifying the two companies Defendants concluded were infringing, and inviting me to call him at my convenience.

11. I sent another email to Mr. Boyd on December 10, 2018, asking for his time zone

so I would know what time to call him as I was in the United Kingdom was not sure what time zone Mr. Boyd lived in. I also suggested that Mr. Boyd could pursue the company I had made reference to in my September 26, 2018 email because I had since learned that this company was now selling product. I ended up not calling Mr. Boyd because I did not see an email from him providing his time zone.

12. Between December 10, 2018 and January 15, 2019, Mr. Boyd and I exchanged several more emails, including my updates on Griffen's production status and Mr. Boyd's update – in response to my inquiries – regarding the status of infringement claims against the three identified companies.

13. Much to my shock, on February 20, 2019, I received a Notice of Termination from Defendants, supposedly effective February 16, 2019. According to this Notice, Griffen had defaulted on a material term of the License Agreement. In particular, the Notice claimed that Griffen repeatedly failed to inform Defendants promptly in writing of any alleged infringement by COMPANY X of the Patent, despite Defendants' purported repeated requests for such information. I was surprised by this allegation because I had previously explained to Mr. Boyd that we had concluded COMPANY X was not infringing, and Mr. Boyd had indicated to me in an email that he understood and that there was no obligation to disclose a company that is not infringing the '378 Patent. I was also shocked because this Notice came just as Griffen's contractors were beginning prototype testing and I was contracting for manufacture and distribution of the product developed based on the license.

14. Through counsel, Griffen replied to the Notice by explaining, again, that when Griffen contacted COMPANY X, it was not to allege infringement because, in Griffen's opinion, *no infringement was then occurring and thus there was no alleged infringement to report to*

4

*Defendants*. Instead, Griffen merely informed COMPANY X, that if it decided to upgrade its product, it could obtain a sub-license of the '378 Patent. In the same letter responding to the Notice of Termination, Griffen asked to implement the dispute resolution procedures set forth in the License Agreement.

15. On February 28, 2019, I participated in a telephone call with Mr. Boyd. Both of us were represented by counsel on the call. In the initial minutes of the call, Mr. Boyd focused on Griffen's purported failure to identify COMPANY X and its infringing product despite requests from Mr. Boyd for detailed information. Once again, I, with my counsel, repeated to Mr. Boyd the belief that COMPANY X was not infringing the '378 Patent when counsel investigated the company's product in mid-2018. In this same call, Mr. Boyd expressed dissatisfaction with the amount and frequency of information I had supposedly provided, or not provided him, related to the product development. Mr. Boyd then requested details on product design, component costs, development contractors, contract manufacturers and distributors. Mr. Boyd's counsel then proposed that Mr. Boyd, through his attorneys, would provide a list of requested information and documents to my counsel within three days, and that I should respond with the requested information within five days. I agreed to this proposal to provide more information regarding development and manufacturing of a licensed product. I agreed to this to address Mr. Boyd's concerns even though nothing in the License Agreement mentions or requires Griffen to provide such proprietary information. Nothing further was agreed to between the parties in this call. At no time during this call did Mr. Boyd or his counsel mention amending or replacing the License Agreement.

16. I waited for Mr. Boyd's list of requested information as the parties had discussed and agreed. Accordingly, it was with great surprise that I learned on March 18, 2019, Defendants sent a document that was not a list of requested information as Mr. Boyd and I had agreed to on the telephone call but instead an entirely new license agreement intended to replace the License Agreement Mr. Boyd and I had negotiated and for which Griffen already paid a non-refundable $10,000 license fee. The terms of this new agreement were completely one-sided in Defendants' favor, including mandatory terms for non-exclusivity, payment of an additional non-refundable $250,000 advance on royalties, further advances against future royalties upon request, a royalty rate of 9% on gross revenues instead of gross profits, weekly email progress reports on development and production, and weekly sales reports and forecasts. In addition, the new license agreement would require Griffen to produce proprietary confidential information, enable Defendants to terminate the agreement at any time for any reason, and require Griffen to defend against any invalidity actions raised against the patent rights as well as bring infringement actions at its own expense without the right to receive any damages collected in such actions. In light of the completely unreasonableness of this new agreement, I responded through counsel that Griffen could not possibly accept this proposed agreement, and instead provided a list of documents that I was willing to produce regarding the development of the Licensed Product. These were the kinds of documents that had been addressed in our February 28 call, and the kind of list which the parties had agreed Defendants would provide to Griffen.

17. In response, on April 1, 2019, Defendants, through counsel, informed Griffen that if Griffen could not accept the new agreement, then the previous Notice of Termination of the License Agreement was back in effect as of April 1, 2019.

18. After almost a year of untold time and hundreds of thousands of dollars expended on production, and significant contracts entered into to develop our vehicle security product, Griffen faces the potential for huge losses if Defendants are permitted to arbitrarily terminate the License Agreement. Griffen's losses are not just what has been spent and what is programmed to be spent (*e.g.*, most recently, SEMA show booked in Las Vegas for November 2019). Beyond those direct losses there would the loss of future income and profit for the company that can run into millions of dollars, not to mention the loss of professionalism in the eyes of reputable distributors who are waiting for Griffen to show them our prototypes. Thus, if allowed to skirt their obligations under the License Agreement and to terminate Griffen's exclusive patent rights which we acquired with the License Agreement, Defendants will harm Griffen's business as well as damage its relationships with many companies around the world. Just at the moment that Griffen is poised to succeed with the vehicle security product to which it has been single-mindedly devoted to developing since receipt of the exclusive patent license rights, its legs are about to be cut out from under the company if Defendants terminate the License Agreement.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Executed this 18 day of April, 2019.

_____  Gavin P. Wilding