UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GRIFFEN SECURITY, LLC,<br><br>               *Plaintiff,*<br><br>    v.<br><br>BOBBIE THOMPSON, MARKEITH<br>BOYD, SHIRLEY LORRAINE BOYD,<br>*and* CITADEL CAR ALARMS, LLC.,<br><br>               *Defendants.* | Case No.  1:19-cv-03494 |

**PLAINTIFF GRIFFEN SECURITY, LLC'S MEMORANDUM OF LAW IN SUPPORT O
MOTION FOR PRELIMINARY INJUNCTION**

**HODGSON RUSS LLP**
605 Third Avenue, Suite 2300
New York, New York 10158
(212) 751-4300
*Attorneys for Plaintiff*

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................... 1

STATEMENT OF FACTS ....................................................................................... 3

ARGUMENT ........................................................................................................... 13

    I.    Plaintiff Has No Adequate Remedy at Law and Will Suffer Irreparable Harm ....... 14

    II.    Plaintiff is Likely to Succeed on the Merits ................................................. 15

    III.    The Balance of Hardships Favors Plaintiff .................................................. 18

    IV.    No Disservice to the Public Would Result from a Preliminary Injunction ............ 19

CONCLUSION ....................................................................................................... 20

# TABLE OF AUTHORITIES

## Cases

*Allergen Optical, Inc. v. Cohen*, No. 89-4082,
    1990 U.S. Dist. LEXIS 13704 (E.D.N.Y. Feb. 13, 1990)……………………………………13

*American Hospital Supply Corp. v. Hospital Prods. Ltd.*
    780 F.2d 589 (7th Cir. 1986)…………………………………………………...…………..…13

*ARP Films, Inc. v. Marvel Entertainment Group, Inc.*,
    952 F.2d 643, 649 (2d Cir. 1991)…………………...……………………………………………17

*Bausch & Lomb Inc. v. Bressler*,
    977 F.2d 720, 727 (2d Cir. 1992)……………………………………………………………...….16

*Consumers Power Co. v. Nuclear Fuel Servs., Inc.*,
    509 F. Supp. 201, 211 (W.D.N.Y. 1981) ………………………………………………………16

*Cordis Corp. v. Medtronic, Inc.*, 835 F.2d 859, 863 (Fed. Cir. 1987)…………………………….13

*Cuciniello v. Cuciniello*, 378 N.Y.S.2d 976, 977 (N.Y. Sup. Ct. 1976)……………………………19

*Felix Frank Assocs., Ltd. v. Austin Drugs, Inc.*, No. 96-7604,
    1997 U.S. App. LEXIS 19795, at *14  (2d Cir. Apr. 10, 1997)…………………………...………16

*Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005)…………...……………….14

*Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002)……………………………...……….14

*Macom Tech. Solutions Holdings, Inc. v. Infineon Techs. AG*,
    881 F.3d 1323 (Fed. Cir. 2018)…...………………………………...…………………………...….13

*MercExchange, L.L.C. v. eBay, Inc.*, 547 U.S. 388, 391 (2006)……...……………………….18

*Miller v. Cont'l Ins. Co.*, 40 N.Y.2d 675, 679 (N.Y. 1976)……………………………………….19

*Novo Nordisk of North Am., Inc. v. Genentech, Inc.*,
    77 F.3d 1364, 1367 (Fed. Cir. 1996)……………………………………...…………………13

*Polymer Techs. v. Bridwell*, 103 F.3d 970, 973 (Fed. Cir. 1996)………...……………………….13

*Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004)………………...……………15

*Rex Med. L.P. v. Angiotech Pharms. (US), Inc.,*
   754 F. Supp. 2d 616 (S.D.N.Y. 2010)……………………...................………13, 15, 17, 19

*Salinger v. Colting,* 607 F.3d 68, 80 (2d Cir. 2010)……………………………………..……18

*Sanofi-Synthelabo v. Apotex, Inc.,*
   488 F. Supp. 2d 317, 325-26 (S.D.N.Y. 2006)…………………….…………………..………12

*Tom Doherty Assocs. Tom Doherty Assocs, Inc. v. Saban Entm't, Inc.,*
   60 F.3d 27 (2d Cir. 1995)……….………………………………………..……….....………15

*Wali v. Coughlin,* 754 F.2d 1015, 1025 (2d Cir. 1984)………………………………….......17

*Wechsler v. Hunt Health Sys.,* 330 F. Supp. 2d 383, 415 (S.D.N.Y. 2004)……...…………..……16

*Winter v. Natural Res. Defense Council,* 555 U.S. 7 (2008)……………………..…………...18

**Rules**

Fed. R. Civ. P. 65(a)………......……………………………………………………….......1

Plaintiff Griffen Security, LLC ("Griffen") respectfully submits this memorandum of law in support of its motion for preliminary injunction, pursuant to Fed. R. Civ. P. 65(a).

## INTRODUCTION

Ten months into an exclusive patent license contract with Defendants, with hundreds of thousands of dollars invested by Plaintiff in product development and testing, Plaintiff is on the verge of entering production and sales agreements to launch an innovative vehicle security product based on the license patent only to have Defendants noticing termination for a breach that is without any basis. Despite efforts to address Defendants' demands for more product information not required or even contemplated by the parties' agreement, Plaintiff now faces catastrophic disruption to its product launch, including interference with vital business partnerships and significant financial loss by Defendant's imminent termination of the patent license.

Plaintiff Griffen Security, LLC is in the business of developing and selling vehicle security systems. The Individual Defendants are the joint inventors of U.S. Patent No. 7,319,378 ("the '378 Patent"), and co-owned all rights in the '378 Patent through the beginning of May, 2018. Between May 7 and May 9, 2019, the Individual Defendants all assigned their rights and interest in the '378 Patent to Citadel.

In May, 2018, Plaintiff acquired from the Individual Defendants an exclusive, royalty-bearing license to make, use, sell, offer for sale, and import in the United States, products within the scope of the '378 Patent for the remaining life of the patent (the "License Agreement") (*See* Compl. Ex. A (ECF No. 1-1).) Relying on the License Agreement, Plaintiff immediately began development of the new vehicle security system product based on the claims of the '378 Patent.

On February 16, 2019, the Defendants, through counsel, sent to Plaintiff a Notice of Termination ("Notice") purporting to terminate Plaintiff's exclusive license. Specifically, the

Notice alleged that Plaintiff had breached the provision in the License Agreement requiring Plaintiff to notify Defendants in writing of any "alleged infringement," and that the License Agreement would terminate in thirty days of the Notice if such breach was not cured.  In response, Plaintiff denied the alleged breach, and requested a meeting by telephone to attempt to resolve the apparent dispute per the dispute resolution provisions in the Agreement.  On February 28, 2019, Plaintiff's representative and Defendant Markeith Boyd, on behalf of all of the Defendants, held a telephone conference with counsel to resolve the dispute over the License Agreement.  During this call, Plaintiff again explained to the Defendants that it had not breached the License Agreement, but in an effort to defuse the dispute, agreed to Defendants' proposal to provide additional product development information responsive to a list of items Defendants agreed they would send in the future, although Plaintiff was not obligated under the terms of the License Agreement to provide such information.  In turn, Defendants agreed to a "standstill agreement" tolling the thirty-day cure period triggered by the Notice.

However, instead of sending a list of sought-after information, on March 18, 2019, Defendants sent to Plaintiff an entirely new license agreement to replace the existing License Agreement.  This unsolicited new agreement, if implemented, would materially alter the terms of Plaintiff's exclusive license to the '378 Patent by making the license non-exclusive in consideration for an additional non-refundable upfront payment of $250,000 with that license subject to termination by Defendants at any time "for any reason whatsoever."  Plaintiff naturally rejected the proposal to replace the License Agreement, and responded by sending to Defendants a proposed side agreement that embodied the sharing of product development information which was agreed upon by the parties during the February 28, 2019 conference call.  On April 1, 2019, the Defendants rejected Plaintiff's proposed side agreement, and instead restated their intent to

terminate the License Agreement unless Plaintiff accepted the new license.  With the new vehicle security product about to enter production and the absurd terms of Defendants' new agreement, Plaintiff cannot accept the new license.  Thus, Plaintiff is facing termination of the License Agreement within thirty (30) days if not sooner.

Unless this Court preserves the *status quo* by entering a preliminary injunction to prevent termination of the License Agreement, Plaintiff will lose valuable and unique patent rights that cannot be recovered.  That loss will upend Plaintiff's investments in development and manufacturing of vehicle security product based the patented technology.  Further, Plaintiff stands to lose customers, future sales, as well as its goodwill and competitive position in an emerging market.  Such losses would also negatively impact future royalty payments to Defendants under the License Agreement.  Defendants will still benefit from the contract terms they themselves negotiated because Plaintiff intends to pay Defendants royalties as defined in the License Agreement.  If Defendants terminate the License Agreement and then license the Patent to third parties, Defendants would thrust those third parties into disputes over rights in the Patent once this Court rules on Plaintiff's requests for an order of specific performance and/or declaratory judgement.  Further, by requiring Defendants to adhere to the terms of an agreement they negotiated in an arm's length transaction with the advice of counsel, the court will uphold the principle and public expectancy that a party will and must abide by the terms of a contract fairly entered into. In short, all parties, including Plaintiff, the Defendants, potential third-party licensees and the public, will only benefit from entry of a preliminary injunction.

## **STATEMENT OF FACTS**

### Plaintiff's Business

Plaintiff Griffen Security, LLC was formed in 2014 to develop a vehicle immobilizer

3

product designed to stop vehicle thefts. (*See* Declaration of Gavin P. Wilding dated April 18, 2019 ("Wilding Decl.") ¶ 1.)

In late 2017, Plaintiff decided to develop a new vehicle security system product and service. (*Id.* ¶ 2.) Before beginning development of this new product, a limited patent search was performed to identify patents and prior art relevant to the contemplated vehicle security product. (*Id.* ¶ 2.) This patent search identified the '378 Patent, which claims elements similar to those envisioned for the new vehicle security product. (*Id.* ¶ 2.)

The Parties' License Agreement

The License Agreement grants to Plaintiff "a U.S. exclusive, royalty-bearing license to make, have made, use, sell, offer for sale, or import Licensed Products in the Field of Use for the Term of this Agreement." (Compl. Ex. A, ¶ 2(a) (ECF No.1-1).) The Field of Use is defined in paragraph 1(b) as "vehicle security systems." (*Id.*) In the License Agreement, Defendants Bobbie Thompson, Markeith Boyd and Shirley Lorraine Boyd (the "Individual Defendants") represented and warranted that they "(i) own and hold, free and clear of all liens or encumbrances of any kind whatsoever, all right, title and interest in the Licensed Patent, (ii) have the exclusive right to license the Licensed Patent, and (iii) have the exclusive right to bring action for the infringement of the Licensed Patent." (*Id.* ¶ 7(a).) The terms of the License Agreement inure to the benefit of and are binding upon the parties' "successors in interest and permitted assigns." (*Id.* ¶ 13(b).)

The License Agreement also specifies the license fee and royalties. Specifically, the License Agreement requires Plaintiff to pay to the Individual Defendants a non-refundable fee of $10,000, as well as a five percent (5%) royalty of the Gross Profit on Licensed Products, except for those manufactured and used for development, testing, marketing, demonstrations or other non-revenue purposes or uses. (*Id.* ¶¶ 3(a)–(b).) "Licensed Products" is defined as "any product within

4

the Field of Use the manufacture, use, importation, offer for sale or sale of which would infringe a Valid Claim absent the license set forth in Section 2." (*Id.* ¶ 1(d).)  The $10,000 license fee was paid to the Defendants' patent counsel in June, 2018.  (Wilding Decl. ¶ 2; Compl. Ex. K (ECF No. 1-11).)

In addition, the License Agreement requires Plaintiff to inform the Individual Defendants or their successors in interest "promptly in writing of any alleged infringement by anyone of the Licensed Patent and shall provide any evidence indicating such infringement," as well as granting the Individual Defendants "the exclusive right but not the obligation to prosecute all infringements of the Licensed Patent at their own expense." (Compl. Ex. A ¶ 4(b) (ECF No. 1-1).)  Either party of the License Agreement may terminate the agreement "in the event of a default by the other Party of any material obligation in this Agreement, effective thirty (30) days after written notice of such default is received by the Party in default, and provided that the Party in default has not remedied the default during such thirty (30) day notice period to the non-breaching Party's reasonable satisfaction." (*Id.* ¶ 6(c).)  Additionally, Plaintiff has the right to terminate the License Agreement upon written notice at any time for any reason, with any royalties not already paid on Licensed Products due and payable.  (*Id.* ¶ 6(b).)

The License Agreement does not include any mention or contemplate any obligations of Plaintiff to provide product development status reports, does not specify a product development schedule, and does not require Plaintiff to provide Defendants with any information regarding licensed product designs, suppliers or marketing.

Plaintiff's Development Work Under the License

After entering into the License Agreement, Plaintiff initiated development of a product consistent with the claims of the '378 Patent.  (Wilding Decl. ¶ 5.)  The product is now in initial

testing, with plans in place to move to production in August 2019 to support initiating sales in September 2019.  (*Id.* ¶ 5.)  To date, Plaintiff has expended significant effort and entered into contracts with a number of companies to develop the product, having already spent over $168,000 with contractual commitments to expend another $42,000 to finish product development.  (*Id.* ¶ 6.)  Further costs will soon be incurred by Plaintiff as the product enters pre-production testing, manufacturing and then sales.  (*Id.* ¶ 6.)  Therefore, the exclusive patent rights acquired in the License Agreement (Compl. Ex. A (ECF No. 1-1)) are valuable to Plaintiff's business, and the impending termination imperils significant investments of capital in the new vehicle security product.  (*Id.* ¶ 18.)

Plaintiff's Communications: No Known Infringement

In an email dated September 26, 2018, regarding Plaintiff's product development, Plaintiff's representative, Mr. Wilding, informed Defendant Markeith Boyd that there was a company that was "developing a similar product . . . in the high end price bracket," that he had made the company aware of the '378 Patent, and therefore the company would not allow anything to come to market without acquiring a license. (*See* Compl. Ex. N, 1–2 (ECF No. 1-14).)  After sending an email in response on September 26, 2018, thanking Mr. Wilding for the information, Mr. Boyd sent another email to Mr. Wilding on September 27, 2018 that included a series of detailed questions about the company mentioned in Mr. Wilding's September 26 email, referring to it as the "company that's infringing our patent." (*See* Compl. Ex. O, 4 (ECF No. 1-15).)  Mr. Wilding responded on September 29, 2018, clarifying that the company had not launched a product yet, so there was no known infringement.  (*See Id.* 3–4.)

On September 29, 2018, Mr. Boyd sent another email to Mr. Wilding, repeating requests for detailed information about the company, stating that the basis for the requests comes from

Section 4(b) of the License Agreement.  (*See Id.* 3.)

On October 3, 2018, Mr. Wilding replied to Mr. Boyd by email, stating:

> Let me set this out correctly for you. I have information about a product that
> looked like it might infringe on your patent, however at this stage we have
> no evidence they will upgrade there [*sic*] system to an infringing product.
> As and when we have clear evidence of this we will indeed under our
> licence agreement contact you with there[sic] details.  At this stage there is
> no evidence, and my lawyers have written to this company informing them
> of our concerns and offering to licence our patent to them should they decide
> to upgrade to a video product.  I do not wish to sound offish for not giving
> you details at this point, however I would rather wait to see if they decide
> to build an upgrade that will infringe.

(*Id.* 2.)  That same day, Mr. Boyd replied, stating, among other things: "Understandably, the company that you have identified as a potential infringer has NOT yet violated our patent, and thus, you are under NO obligation to disclose any information regarding this organization." (*Id.*)

On November 28, 2018, Mr. Boyd emailed Mr. Wilding, inquiring about the status of the product development.  (Compl. Ex. P, 1–2.)  Mr. Wilding replied that same day, stating: "I am due to Fly to Scotland on Friday to see the completed Mechanical, I hope to see a mockup of the product.  Sadly we are 8 weeks behind our original schedule, but we are working our way forward.  During my visit I am visiting the factory who will produce the first run." (*Id.* 1.)  Mr. Boyd then replied: "That's encouraging news.  Thanks a bunch, and please continue to keep us posted." (*Id.*)

On December 5, 2018, Mr. Boyd emailed Mr. Wilding to report that they had identified two possible infringers and decided to pursue an infringement case against them, and instructed their attorneys to send the initial Cease and Desist letter.  (*See* Compl. Ex. Q, 3 (ECF No. 1-17).)  Mr. Wilding immediately replied by email, expressing surprise to hear about the two identified infringers, stating, "I am aware that [COMPANY X][1] is now selling," and asking about the two identified infringers.  (*Id.*, 2.)  Mr. Wilding's email also provided a status update on the product

---

[1] "COMPANY X" is not identified as it is an uninvolved third party.

development effort based on his trip to Scotland.  (*Id.* 3.)  Mr. Boyd replied the same day, naming the two identified companies against which actions were being taken (neither of which was COMPANY X), and inviting Mr. Wilding to call him at Mr. Wilding's convenience. (*Id.* 2.)

On December 10, 2018, Mr. Wilding emailed Mr. Boyd, commenting on the two identified companies.  Mr. Wilding's email also stated: "[COMPANY X] are selling so you might as well pick upon that one too if you want too." (*Id.*)  That email also requested a time to have a telephone call per Mr. Boyd's request. (*Id.*)  Mr. Boyd replied by email that same day, proposing a time for the call.

On January 15, 2019, Mr. Boyd emailed Mr. Wilding requesting an update, asking: "Any new developments or progress?  Please advise." (Compl. Ex. R, 2 (ECF No. 1-18).)  Mr. Wilding replied immediately by email explaining he was going to call at the end of the year but had not received an email reply from Mr. Boyd with his time zone. (*Id.*)  Mr. Wilding's email also provided a status update, stating: "Things are progressing well if not slowly.  We should have our prototypes finished by the end of February, when I have some final designs I will forward them to you." (*Id.*)  Mr. Boyd replied by email that same day, stating: "Thanks for the update!  Just keep us in the loop.  I'll follow up in another month or so." (*Id.* 1.)

On January 15, 2019, Mr. Wilding sent an email to Mr. Boyd, asking: "how you have got on with companies using your patent as I asked in my last email?" (*See* Compl. Ex. R (ECF No. 1-18).)  Mr. Boyd replied on January 16, 2019, explaining that Cease and Desist letters had been sent out, and that the legal team was preparing claim charts. (*Id.*)  Mr. Boyd's email also asked for the name of the company that Mr. Wilding had communicated with.  Mr. Wilding replied immediately by email saying: "I do believe I did give you this but here it is again, everything you need to know is on this website: [COMPANY X].com.  That good to hear Markeith, keep on top

of them all." (*Id.* 1.) Mr. Boyd replied immediately by email, saying only: "Got it." (*Id.*)

First Notice of Termination

On February 20, 2019, Mr. Wilding received an email from Defendants' patent counsel with the Notice of Termination. (*See* Compl. Ex. B (ECF No1-2); Wilding Decl. ¶ 13.) The Notice purports to provide notice of termination of the License Agreement effective February 16, 2019 due to default of a material obligation. (*See* Compl. Ex. B, 1 (ECF No.1-2).) Specifically, the Notice alleges that Plaintiff "repeatedly failed to 'inform Licensors promptly in writing of any alleged infringement' by [COMPANY X] of the licenced [*sic*] patent, despite Licensor's repeated requests," and quotes the email exchanges between Mr. Boyd and Mr. Wilding as substantiation. (*See* Compl. Ex. B, 1-2 (ECF No. 1-2).) The Notice concludes: "Pursuant to Section 6(c) of the License Agreement, Licensors hereby place Licensee on Notice of License Agreement Termination. Licensee has thirty (30) days after receipt of this notice of such default to remedy the breach to Licensors' satisfaction." (Compl. Ex. B, 2 (ECF No. 1-2).)

Following the Notice, Plaintiff's patent counsel left multiple unreturned voice mails with Defendants' patent counsel in order to resolve the issues raised in the Notice. Defendants' patent counsel did not call (and has not called) Plaintiff's patent counsel. Thereafter, Plaintiff's patent counsel prepared and emailed to Defendants' patent counsel a Response, which objected to the Notice for failing to state valid grounds for termination because, as Defendants admitted in the Notice, Plaintiff at no time had alleged infringement by COMPANY X. (*See* Compl. Ex. C (ECF No. 1-3); Wilding Decl. ¶ 14.) In particular, the Response stated:

> I carefully reviewed the facts available to us after reasonable due diligence (including studying their website, viewing videos of the product in use and patent searches) and concluded that [COMPANY X] failed to satisfy a key limitation of the independent claims of the '378 patent. Based on my analysis of the [COMPANY X] product, it was and remains my legal conclusion that [COMPANY X] did not infringe

> the '378 patent in 2018 . . ..Accordingly, Mr. Wilding did not make any
> such infringement allegation, instead writing [COMPANY X] to
> propose a sub-license if they want to upgrade their product to add the
> feature of the '378 patent missing from their current product. It was this
> potential for a future sublicense that Mr. Wilding discussed with your
> client. Accordingly, Griffen Security has had and continues to have no
> basis for an allegation of infringement. Thus, there has never been an
> obligation to report an allegation of infringement.

(*Id.*) The Response further explained that "there is a significant legal difference between (i)

identifying a company that might one day desire a sublicense for an upgraded product and (ii)

finding evidence of infringement rising to the level of an "allegation of infringement" under

paragraph 4(b) of the Agreement." (*Id.* 1-2.) The Response concluded by requesting a call to

schedule a negotiation telephone call between Mr. Boyd and Mr. Wilding as specified in the

dispute resolution procedure specified in paragraph 11(a) of the License Agreement. (*Id.*)

On February 28, 2019, a telephone conference call was held between Mr. Boyd, Mr.

Wilding, Defendants' patent counsel, Defendants' litigation counsel and Plaintiff's patent counsel.

The discussion first focused on Plaintiff's failure to identify COMPANY X as an infringing

product despite requests for detailed information. (Wilding Decl. ¶ 15.) Plaintiff's patent counsel

explained that it was and remains his legal opinion that COMPANY X does not infringe the '378

Patent, a position that Plaintiff accepted, and the reason why no formal written disclosure of an

alleged infringement was made by Plaintiff. (Wilding Decl. ¶ 15.) Mr. Boyd stated that Defendants

had determined that COMPANY X was infringing since early in 2018.  Mr. Boyd expressed

dissatisfaction with the amount and frequency of information provided by Plaintiff related to the

product development, and requested details on product design, component costs, development

contractors, contract manufacturers and distributors. (Wilding Decl. ¶ 15.) To resolve this dispute,

Defendants' counsel proposed and Plaintiff agreed that Mr. Boyd, through his attorneys, would

provide a list of requested information and documents to Plaintiff's patent counsel within three days, and that Plaintiff would respond with the requested information within five days. (Wilding Decl. ¶ 15.) Mr. Wilding accepted this offer to provide more information regarding development and manufacturing of a licensed product. (Wilding Decl. ¶ 15.) There was no other agreement reached, and no mention of or agreement to amend or replace the License Agreement. (Wilding Decl. ¶ 15.)

However, on March 18, 2019, Plaintiff's patent counsel received an email from Defendants' patent counsel with a document entitled "License Agreement" (Compl. Ex. D (ECF No. 1-4)), and stating: "Attached please find a new licensing agreement between our clients. It was cleaner to draft this agreement from scratch, rather than amend the former agreement. You will see the list of Citadel's requested information incorporated in this agreement." (*See* Compl. Ex. D (ECF No. 1-4); Wilding Decl. ¶ 16.)

In addition to not agreeing to amend or replace the License Agreement, several terms in the proposed new license agreement were unacceptable to Plaintiff as unreasonable or incongruent with a patent license. Such terms include, for example, the fact that the proposed new license would have provided a non-exclusive license to the '378 Patent instead of the exclusive license granted to Plaintiff under the License Agreement; a requirement for payment of a non-refundable two-hundred fifty thousand dollar ($250,000) advance on royalties; a requirement for Plaintiff to pay further advances against future royalties upon request; a royalty rate of nine percent (9%) on gross revenues instead of gross profits; weekly email progress reports on research, development, implementation and production of the product, and as well as weekly sales reports and sales forecasts; and requirements to produce information that is proprietary to Plaintiff . (*See* Compl. Ex. D (ECF No. 1-4); Wilding Decl. ¶ 16.) The proposed new license

would also grant Defendants the right to terminate the agreement at any time "for any reason whatsoever," and would require Plaintiff to vigorously defend at its own expense any invalidity actions brought against the patent rights, as well as to bring infringement actions at its own expense without permitting Plaintiff to receive damages collected in such actions.  (*See* Compl. Ex. D, 7 (ECF No.1-4).)

On March 28, 2019, Plaintiff's patent counsel emailed the Defendants' patent counsel declining the new license agreement and proposing instead a Side Agreement (Compl. Ex. E (ECF No. 1-5)), which reflected the verbal agreement reached during the February 28, 2019 telephone call between the parties.  In particular, the proposed Side Agreement, which did not constitute an amendment or replacement of the License Agreement, listed documents and information that Plaintiff is willing to produce to Defendants regarding development of a Licensed Product. (*See* Wilding Decl. ¶ 17.)

Second Notice of Termination

On April 1, 2019, Defendants' patent counsel sent an email to Plaintiff's patent counsel, stating:  "We received your side agreement draft between Plaintiff Security and Citadel's patentees and regret to inform you that our client cannot accept or agree to your agreement.  We ask you to reconsider the License Agreement that was offered, which we believe provides a mutually beneficial resolution, without beginning prolonged and expensive federal litigation. If that is not acceptable, then the standstill agreement would no longer be tolled. Our previous notice that the original License Agreement is null and void would apply from today's date and trigger the process set forth in the license. We look forward to hearing from you." (Compl. Ex. F (ECF No. 1-6); Wilding Decl. ¶ 17.)

## ARGUMENT

A preliminary injunction should issue because Plaintiff is likely to suffer irreparable harm in the absence of an injunction, Plaintiff has a reasonable likelihood of success on the merits, the balance of equities tips in Plaintiff's favor, and an injunction is in the public interest. *See Macom Tech. Solutions Holdings, Inc. v. Infineon Techs. AG*, 881 F.3d 1323 (Fed. Cir. 2018); *Sanofi-Synthelabo v. Apotex, Inc.*, 488 F. Supp. 317, 325-26 (S.D.N.Y. 2006) (citing *Polymer Techs. v. Bridwell*, 103 F.3d 970, 973 (Fed. Cir. 1996); *Novo Nordisk of North Am., Inc. v. Genentech, Inc.*, 77 F.3d 1364, 1367 (Fed. Cir. 1996)).

If the *status quo* is not preserved, the losses and competitive harms that Plaintiff will suffer will far exceed the burden of keeping Defendants bound to the parties' exclusive license agreement while this Court hears this case. In like cases, courts within the Second Circuit and elsewhere have granted preliminary injunctions pending a resolution on the merits. *See, e.g., Macom Tech. Solutions Holdings, Inc. v. Infineon Techs. AG,* 881 F.3d 1323 (Fed. Cir. 2018) (upholding preliminary injunction order declaring patent license agreement to remain in full force and effect despite licensor's purported termination); *Rex Med. L.P. v. Angiotech Pharms. (US), Inc.,* 754 F. Supp. 2d 616 (S.D.N.Y. 2010) (enjoining respondent from terminating exclusive license to petitioner to market and distribute respondent's product); *Allergen Optical, Inc. v. Cohen*, No. 89-4082, 1990 U.S. Dist. LEXIS 13704 (E.D.N.Y. Feb. 13, 1990) (granting licensee's motion for preliminary injunction); *see also American Hospital Supply Corp. v. Hospital Prods .Ltd.* 780 F.2d 589 (7th Cir. 1986) (upholding preliminary injunction order enjoining termination of an exclusive distribution license).

By granting this motion, the Court would "protect the respective rights of the parties pending a determination on the merits." *Cordis Corp. v. Medtronic, Inc.*, 835 F.2d 859, 863 (Fed.

13

Cir. 1987).

## I.   Plaintiff Has No Adequate Remedy at Law and Will Suffer Irreparable Harm

A movant satisfies the irreparable harm requirement when it shows that absent a preliminary injunction, it "will suffer 'an injury that is neither remote nor speculative, but actual and imminent,' and one that cannot be remedied 'if a court waits until the end of trial to resolve the harm.'" *Freedom Holdings, Inc. v. Spitzer,* 408 F.3d 112, 114 (2d Cir. 2005) (citations omitted); *see also Kamerling v. Massanari,* 295 F.3d 206, 214 (2d Cir. 2002) (explaining a movant can establish irreparable harm if it shows that "there is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation." (internal quotation marks and citations omitted)).

Plaintiff will suffer immediate and irreparable harm as a result of Defendants' attempt to terminate Plaintiff's exclusive license to the '378 Patent without justification. An exclusive patent license is a unique property right, and equity demands its specific performance. Further, after-the-fact monetary damages will not make Plaintiff whole, as the value of rights in the '378 Patent has not been tested by actual sales of products practicing the technology. In particular, any data by which that value might be estimated is future and contingent.

Moreover, damage to Plaintiff by its investment in developing the products in reliance on the '378 Patent will be substantial, not only monetarily but with respect to lost opportunity and business viability. Specifically, Plaintiff stands to lose future market share, customers, business, profits, and goodwill it has established within the industry if Defendants are permitted to unilaterally terminate the License Agreement during this pendency of this action. As set forth by the Second Circuit, such losses may be evidence of irreparable harm where "the very viability of the plaintiffs business or substantial losses of sales beyond those of the terminated product have

been threatened." *Rex Med. L.P. v. Angiotech Pharms. (US), Inc.*, 754 F. Supp. 2d 616, 622 (S.D.N.Y.) (quoting *Tom Doherty Assocs. Tom Doherty Assocs, Inc. v. Saban Entm't, Inc.*, 60 F.3d 27 (2d Cir. 1995). Further, a company's "loss of reputation, good will, and business opportunities" from a breach of contract can constitute irreparable harm. *Id.* at 621 (quoting *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004)).

Here, Plaintiff's business in the U.S. is premised on the vehicle security product that has been developed under the rights of the License Agreement. (Wilding Decl. ¶¶ 1-4.) With that product about to enter manufacture, it is too late to redesign to a non-infringing product without the loss of all investments, not to mention the loss of prospective profits as well as reputational damage Plaintiff would suffer with investors and already-contracted engineering, manufacturing and distribution companies. Plaintiff has relied on the License Agreement by developing a product consistent with the claims of the '378 Patent, and therefore will infringe at least one claim of that patent unless redesigned (or a different product is developed) to avoid infringement. (Wilding Decl. ¶¶ 1-6, 13,18.) If Defendants are permitted to terminate the License Agreement during pendency of this action, Plaintiff will incur a loss of the $200,000 or more already invested in an infringing product, and will be forced to either incur similar costs and another year delay to develop a non-infringing product or abandon the economic opportunity of the technology that is the basis for Plaintiff's business. (Wilding Decl. ¶ 18.)

## II.   <u>Plaintiff is Likely to Succeed on the Merits</u>

Plaintiff has a strong likelihood of success on the merits, as the declaratory judgment action turns on whether Defendants have the right to unilaterally terminate the License Agreement.

Under the License Agreement, Defendants have no right to terminate unless Plaintiff has defaulted on a material obligation, and has not remedied such default within thirty (30) days after

written notice of such breach was received by Plaintiff. (Compl. Ex. B ¶ 6(c) (ECF No. 1-2).)
When a party purports to exercise its termination rights under a contract, where "the Agreement
specifies conditions precedent to the right of cancellation, the conditions must be complied with."
*Bausch & Lomb Inc. v. Bressler*, 977 F.2d 720, 727 (2d Cir. 1992) (quoting *Consumers Power Co.
v. Nuclear Fuel Servs., Inc.*, 509 F. Supp. 201, 211 (W.D.N.Y. 1981)).

Here, Plaintiff is likely to prevail on its claim that Defendants may not unilaterally
terminate the Agreement under the asserted provision of Section 6(c), which requires the Plaintiff
to have defaulted on a material obligation of the License Agreement. (Compl. Ex. A § 6(c) (ECF
No. 1-1).)

The material obligation on which Plaintiff allegedly defaulted is Section 4(b), which states:
"During the Term of this Agreement, Licensee shall inform Licensors promptly in writing of any
alleged infringement by anyone of the Licensed Patent and shall provide any evidence indicating
such infringement." The License Agreement provides no further requirements with respect to this
provision, including any definition or standard for alleged infringement. Further, the License
Agreement does not define this or any other obligation as a "material obligation."

Defendants' claim in the Notice that Plaintiff failed to inform them promptly in writing of
"any alleged infringement by [COMPANY X] of the licensed patent" is without merit, and cannot
serve as a basis for termination. First, such required disclosure is not a material obligation of the
License Agreement. *See Wechsler v. Hunt Health Sys.*, 330 F. Supp. 2d 383, 415 (S.D.N.Y. 2004).
Under New York law, a material breach is a breach that "go[es] to the root of the agreement
between the parties," and "is so substantial that it defeats the object of the parties in making the
contract." *Felix Frank Assocs., Ltd. v. Austin Drugs, Inc.*, No. 96-7604, 1997 U.S. App. LEXIS
19795, at *14 (2d Cir. Apr. 10, 1997). For example, failure to pay the license fee (which was paid

in June 2018) or pay royalty fees would be a material breach under New York law. *See, e.g., Wechsler*, 330 F. Supp. at 417 ("Failure to tender payment is generally deemed a material breach of a contract.") (quoting *ARP Films, Inc. v. Marvel Entertainment Group, Inc.*, 952 F.2d 643, 649 (2d Cir. 1991)).

Second, as explained to Defendants by both Mr. Wilding and Plaintiff's patent counsel, Plaintiff does not have any evidence or reason to believe that [COMPANY X] has infringed, or is infringing, the patent. Therefore, Plaintiff has plainly not defaulted on this section of the agreement, let alone defaulted on any material obligation. *See, e.g., Rex Med.*, 754 F. Supp. 2d 616 (holding that the conditions specified in the agreement were the only available reasons for unilateral termination by the defendant).

Last, despite not being obligated under the License Agreement, Plaintiff provided Defendants by email with the information about [COMPANY X] in its possession (which was the information available on the company's website identified to Defendants), which remedied any supposed default claimed by Defendants. Plaintiff's Response to the Notice provided further written disclosure of all information known to Plaintiff regarding COMPANY X, further remedying the alleged breach.

Defendants accepted Plaintiff's money and performance under the Agreement, but purport to terminate the License Agreement based on Plaintiff's supposed failure to provide information to which Defendants were not and are not entitled. In particular, Defendants accuse Plaintiff of a breach of the agreement despite: (1) having expressly acknowledged Plaintiff's compliance with Section 6(c) of the License Agreement; and (2) Plaintiff's subsequent communications with Defendants making clear that the information available to Plaintiff did not indicate infringement by COMPANY X.

17

In short, Plaintiff can only surmise that long after negotiating the License Agreement –

with the advice of counsel – Defendants' apparent dissatisfaction with some of the terms of the

License Agreement is driving this termination, and thus Defendants are using a dubious assertion

of default under Section 4(b) of the License Agreement as a pretext to force negotiation of an

entirely different agreement whose terms are decidedly lopsided in favor of Defendants.

For purposes of a preliminary injunction, the Court need not find with absolute certainty

that Plaintiff will succeed on the merits, but rather, only a probability of prevailing. *See Wali v.*

*Coughlin,* 754 F.2d 1015, 1025 (2d Cir. 1984) ("A movant . . . need not show that success is an

absolute certainty. He need only make a showing that the probability of his prevailing is better

than fifty percent. There may remain considerable room for doubt.") Given that Defendants are

unlikely to establish that Plaintiff has defaulted on a material obligation of the License Agreement,

Plaintiff is likely to succeed on the merits that Defendants' attempted termination is invalid.

## III.   The Balance of Hardships Favors Plaintiff

"A court must consider the balance of hardships between the plaintiff and defendant and

issue an injunction only if the balance of hardships tips in the plaintiff's favor." *Salinger v.*

*Colting,* 607 F.3d 68, 80 (2d Cir. 2010) (citing *Winter v. Natural Res. Defense Council,* 555 U.S.

7 (2008); *MercExchange, L.L.C. v. eBay, Inc.,* 547 U.S. 388, 391 (2006)). Specifically, the Court

must weigh the irreparable harm to Plaintiff if preliminary relief is denied against the harm to

Defendants if a preliminary injunction is issued.

Here, the balance of hardships tips decidedly in Plaintiff's favor because enjoining

Defendants from terminating the Licensing Agreement simply maintains the status quo for the

duration of this litigation, without any clear harm to the Defendants who stand to profit from

royalties that will be due upon future sales of Licensed Products. In particular, the existence of

this litigation clouds the title of the '378 Patent such that Defendants are likely unable to enter into additional licensing agreements with third parties until it is resolved, to the extent that is Defendants' aim.   In contrast, the Complaint and the Wilding Declaration submitted with this motion attest to the irreparable harms that Plaintiff would suffer if preliminary relief is denied.

## IV.   No Disservice to the Public Would Result from a Preliminary Injunction

Granting injunctive relief in this case would serve the public interest because "[i]n general, public policy holds competent contracting parties to bargains made by them freely and voluntarily, and requires the courts to enforce such agreements."  *Rex Med*, 754 F. Supp. 2d at 626 (quoting *Cuciniello v. Cuciniello,* 378 N.Y.S.2d 976, 977 (N.Y. Sup. Ct. 1976)).   Here, the Individual Defendants voluntarily entered into the License Agreement with Plaintiff, following substantial and represented negotiation over the terms.  (Wilding ¶¶ 3-4.)

The public has in interest in seeing that parties oblige by their contractual obligations and are not allowed to skirt such obligations at another's expense. *See, e.g., Miller v. Cont'l Ins. Co.,* 40 N.Y.2d 675, 679 (N.Y. 1976) ("[T]he usual and most important function of courts of justice is rather to maintain and enforce contracts, than to enable parties thereto to escape from their obligation on the pretext of public policy."). Thus, this factor also favors the issuance of an injunction to prevent Defendants from attempting to unilaterally terminate the License Agreement for reasons not permitted under or contemplated by its terms.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully urges the Court to grant a preliminary injunction enjoining Defendants from terminating the License Agreement.

Dated: April 19, 2019                    Respectfully submitted,

Jacqueline I. Meyer
JMeyer@hodgsonruss.com
Hodgson Russ LLP
605 Third Ave, Suite 2300
New York, NY 10158
(646) 218-7633 (tel.)
(646) 943-7083 (fax)

Shauna Wertheim (*pro hac vice* pending)
swertheim@marburylaw.com
Robert M. Hansen (pro hac vice pending)
rhansen@marburylaw.com
The Marbury Law Group, PLLC
11800 Sunrise Valley Drive, 15th Floor
Reston, VA 20191
(703) 391-2900 (tel.)
(703) 391-7100 (fax)

*Attorneys for Plaintiff Griffen Security, LLC*