**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

GRIFFEN SECURITY, LLC,

                              *Plaintiff*,

          v.

BOBBIE THOMPSON, MARKEITH BOYD,
SHIRLEY LORRAINE BOYD, *and*
CITADEL CAR ALARMS, LLC.

                              *Defendants*.

---

Case No. _____

**COMPLAINT**

Plaintiff Griffen Security LLC Inc., by and through its attorneys, bring this Complaint against Defendants Bobbie Thompson, Markeith Boyd, Shirley Lorraine Boyd, and Citadel Car Alarms, LLC ("Citadel"), and allege as follows:

## NATURE OF THE CASE

1.     This case results from the Defendants' (the "Licensors") unwarranted attempt to terminate the patent license they granted exclusively to Plaintiff (the "Licensee") in an arm's length transaction based on a meritless allegation of breach of contract. Defendants' wrongful termination of the license will result in losses to Plaintiff of $200,000 or more. This action is being brought in accordance with contract terms agreed to by both Plaintiff and Defendants, and set forth in the patent license agreement.

2.     Plaintiff is in the business of developing and selling vehicle security systems. Plaintiff found U.S. Patent No. 7,319,378 (the "'378 Patent"), owned by the Defendants, while conducting due diligence before developing a new product. After negotiations between Plaintiff and Defendants Bobbie Thompson, Markeith Boyd, Shirley Lorraine Boyd ("Individual Defendants"), in which all were represented by counsel, the parties entered into a patent license

1

for the '378 Patent (the "License Agreement"), Exhibit A, effective May 25, 2018 (the "Effective Date").   Pursuant to the License Agreement, Plaintiff was granted an exclusive license for the '378 Patent in exchange for a $10,000 up front license fee and a five percent (5%) royalty on gross profits of licensed products for the remaining life of the '378 Patent.   On June 22, 2018, Plaintiff wired $10,000 to Defendants' patent counsel for payment of the license fee. Relying on the License Agreement, Plaintiff then began development of a new vehicle security system design based on the claims of the "'378 Patent".

3.      However, on February 16, 2019, Defendants, through counsel, sent to Plaintiff a Notice of Termination to Licensee ("Notice") (Exhibit B), premised on an alleged breach of Section 6(c) of the License Agreement, which requires Plaintiff to inform Defendants promptly in writing of any "alleged infringement" and provide evidence of infringement to Defendants. The Notice stated that the License Agreement would terminate within thirty (30) days of the Notice if the alleged breach was not cured.   In a response to the Notice on February 21, 2019 ("Response") (Exhibit C), Plaintiff, through counsel, explained that Plaintiff had not found infringement or identified an infringer of the '378 Patent, and therefore Plaintiff had not breached the License Agreement; accordingly, there was no breach to cure.   In the Response, Plaintiff requested a meeting with Defendants by telephone to attempt to resolve the apparent dispute per the dispute resolution provisions in Section 11(a) of the License Agreement.   On February 28, 2019, Defendant Markeith Boyd, on behalf of all Defendants, and a representative of Plaintiff (Mr. Gavin Wilding, President and CEO) held a telephone negotiation that included counsel for both parties (the "February 28 Telephone Negotiation").   During the telephone negotiation Defendant Markeith Boyd expressed frustration that Mr. Wilding had not shared sufficient information regarding the development of the new vehicle security system under the

license.  At the conclusion of the discussion, counsel for Defendant Markeith Boyd offered and Mr. Wilding accepted a resolution to the dispute in which Defendants would provide a list of product development information requested of Plaintiff and Plaintiff would then provide such information to Defendant Markeith Boyd.  On this basis, Defendants agreed to a "standstill agreement" tolling the thirty (30) days to license termination which had been triggered by the Notice of Termination.

4.      Instead of providing a list of product development information requested from Plaintiff as agreed during the telephone negotiations, on March 18, 2019, Defendants sent an entirely new license agreement to Plaintiff.  (Exhibit D.)  Ignoring the current valid contract between Defendants and Plaintiff, Defendants proposed a new, non-exclusive license which:  (i) requires Plaintiff to pay a $250,000 up-front non-refundable advance on royalties; (ii) requires Plaintiff to litigate and pay for any enforcement of the '378 Patent against infringers; and (iii) gives Defendants the unqualified right to terminate the license *at any time for any reason*, as well as other onerous terms all of which are inconsistent with the License Agreement reached during the initial contract negotiations and the verbal agreement reached during the February 28 Telephone Negotiation.

5.      On March 28, 2019, Plaintiff through counsel sent Defendants' counsel an email, explaining that Plaintiff "will not agree to replace or amend the license contract that currently exists between the parties." Plaintiff proposed instead a side agreement to the License Agreement (the "Side Agreement").  (Exhibit E.)  Consistent with the resolution proposed by counsel for Defendant Markeith Boyd and accepted by Mr. Wilding during the February 28 Telephone Negotiation, the proposed Side Agreement lists product development information that Plaintiff is willing to provide to Defendants.

6.      On April 1, 2019, Defendants sent an email (Exhibit F) to Plaintiff, rejecting the proposed Side Agreement and demanding reconsideration of the proposed new license agreement: "If that is not acceptable, then the standstill agreement would no longer be tolled. Our previous notice that the original License Agreement is null and void would apply from today's date and trigger the process set forth in the license. We look forward to hearing from you."

7.      Plaintiff maintains that there has been no breach of the License Agreement by Plaintiff, and therefore no basis or reason for termination.  The new license agreement proposed by Defendants' patent counsel is entirely unacceptable for numerous reasons addressed below. Further, cancellation of the License Agreement will cause Plaintiff losses in excess of the $200,000 already invested or committed in developing and testing a product based on the claims of the '378 Patent, forcing Plaintiff either to invest additional funds of a similar amount to develop a non-infringing product or abandon the economic opportunity for which Plaintiff already fairly bargained.  Accordingly, Plaintiff brings this action for a declaratory judgment that Plaintiff has not breached the License Agreement, and for specific performance of the License Agreement by Defendants, or, in the alternative, for breach of contract by Defendants for their failure to comply with the terms of the License Agreement.  In parallel with this complaint, Plaintiff asks this Court for a preliminary injunction to prevent immediate termination of the License Agreement until the Court can hear the case and render judgment.

## THE PARTIES

8.      Plaintiff is a limited liability corporation organized and existing under the laws of the State of Florida, with its principal place of business in Boca Raton, Florida.

9.      On information and belief, Defendant Bobbie Thompson is an individual who resides in New York, New York.  Bobbie Thompson is a listed inventor on the '378 Patent.

10.     On information and belief, Defendants Markeith Boyd and Shirley Lorraine Boyd are individuals who both reside in Fitchburg, Wisconsin.  Both Markeith Boyd and Shirley Lorraine Boyd are listed inventors on the '378 Patent.

11.     On information and belief, Defendant Citadel Car Alarms, LLC ("Citadel") is a limited liability company organized and existing under the laws of the State of Wisconsin, with its principal place of business in Fitchburg, Wisconsin.  On information and belief, Defendant Markeith Boyd is a manager or managing member of Citadel.  On information and belief, the Individual Defendants assigned their rights in the '378 Patent, subject to the License Agreement, to Citadel.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiff and Defendants and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

13.     This Complaint includes a count for declaratory relief under the patent laws of the United States, 35 U.S.C. § 1, *et seq.*  Therefore, this Court also has subject matter jurisdiction over the claims alleged in this action based on jurisdiction over declaratory judgment claims arising under the patent laws pursuant to 28 U.S.C. §§ 1331, 1338, 2201, and 2202.  This Court has jurisdiction over the remaining claims pleaded in this action that do not arise under the patent laws pursuant to 28 U.S.C. § 1367, insofar as they are related to the other claims in the action and form part of the same case or controversy, as well as pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201(a).

14.     This Court has personal jurisdiction over Defendants Bobbie Thompson, Markeith Boyd, and Shirley Lorraine Boyd, as each has consented in writing in section 11(b) of the License Agreement to submit to the jurisdiction of this Court, availing themselves of the

laws of the State of New York.

15.    This Court has personal jurisdiction over Defendant Citadel as an assignee of some or all of the ownership in the '378 Patent, upon which the License Agreement described herein, including the provisions for selection of governing law and jurisdiction over disputes, is expressly binding.

16.    Venue is proper in this district pursuant to the forum selection clause set forth in section 11(b) of the License Agreement, in which the parties "waive any right to claim inconvenient forum."

### PLAINTIFF GRIFFEN SECURITY, LLC

17.    Plaintiff Griffen Security, LLC was formed in 2014 to develop a vehicle immobilizer product designed to stop vehicle thefts.  A proof of concept product has been developed and the company is in discussions with vehicle manufacturers.

18.    In late 2017, Plaintiff decided to develop a new vehicle security system product and service.  At an early stage in developing this new product, a limited patent search was performed on behalf of Plaintiff to identify patents and prior art relevant to concepts for the new vehicle security system product.  This patent search identified the '378 Patent, which claims elements similar to those envisioned for the new vehicle security system product.  This motivated Plaintiff to contact Defendants to determine whether a license to '378 Patent could be negotiated so that the new vehicle security system product could be designed to be covered by the claims of the '378 Patent.

### THE '378 PATENT

19.    The '378 Patent, entitled "Anti-theft System for a Vehicle with Real-Time Notification Feature," issued from an application filed April 12, 2005 that claimed priority to a

provisional application filed April 12, 2004.  Bobbie Thompson, Markeith Boyd, and Shirley Lorraine Boyd are the named inventors.  Mark Levy & Associates, PLLC was the firm that prosecuted the patent application.

20.     While the scope of the claims are not an issue in this case, claim 1 of the '378 Patent recites:  A vehicle anti-theft system, comprising: a) at least one sensor disposed in a vehicle adapted to detect an unauthorized condition in or about said vehicle and for generating an alarm signal in response thereto; b) a transceiver operatively connected to said sensor adapted for transmitting said alarm signal; c) an imaging device disposed in said vehicle and operatively connected to said transceiver, for imaging at least a portion of an occupant of said vehicle upon selective activation by at least said alarm signal; d) a two-way voice communication system disposed within said vehicle and operably connected to said transceiver; and e) a receiver adapted for reception of said signal from said transceiver and disposed remotely therefrom, said receiver being adapted to display at least one of a still image and a streaming video of said imaging device, wherein said receiver is adapted to activate said two-way voice communication.

21.     Based on information maintained in the U.S. Patent and Trademark Office Patent Assignment Database, the '378 Patent was owned by the inventors, i.e., the Individual Defendants, during negotiation of the License Agreement.  In an assignment executed between May 7 and May 10, 2018, the Individual Defendants assigned their rights in the '378 Patent to Citadel. (Exhibit G.)

## NEGOTIATION OF THE LICENSE AGREEMENT

22.     Negotiations between Plaintiff and Defendants began on March 12, 2018 when Plaintiff's patent counsel called the attorney of record (Michael Keenan of Hinman, Howard & Kattell, LLP) for the '378 Patent listed in the USPTO database to ask whether the owners of the

'378 Patent were amenable to discussing a license to the patent.  On March 13, 2018, Defendant Markeith Boyd called Plaintiff's patent counsel directly and told him that the owners of the patent would be interested in doing some kind of deal.  Plaintiff's patent counsel relayed this to Plaintiff's representative, Mr. Wilding, the same day and provided him with Defendant Markeith Boyd's telephone number.

23.    The same day, March 13, 2018, Mr. Wilding called Defendant Markeith Boyd. In that call, Defendant Markeith Boyd declined to sell the '378 Patent, but said he would be interested in negotiating an exclusive license and royalties.

24.    On March 14, 2018, Defendants and Plaintiff entered into negotiations, directly and through their respective patent counsel, that resulted in a Confidentiality and Exclusivity Agreement (Exhibit H) that was executed by Defendant Markeith Boyd and by Mr. Wilding on March 18, 2018, and included a two-way nondisclosure agreement and agreement by the patent owners not to engage in any discussions or agreements with anyone other than Plaintiff for an exclusivity period of sixty (60) days.

25.    License term negotiations between Defendants and Plaintiff began on April 16, 2018 with exchanges of emails between Defendant Markeith Boyd and Mr. Wilding.  (Exhibit I.)  Mr. Wilding began these direct negotiations in an email to Defendant Markeith Boyd that said that Plaintiff had decided to focus on developing a product based on the patented design and offered an up-front payment of $10,000 and accepting the five (5) percent royalty on the profit of licensed products sold.  (See Ex. I at 4-5.)  On or about April 18, 2018 Defendant Markeith Boyd and Mr. Wilding spoke by telephone about license terms, and Defendant Markeith Boyd followed up with an email to Mr. Wilding on April 18, 2018, proposing a counter offer of seven percent (7%) on gross income.  (See id. at 3-4.)  On April 21, 2018, Mr. Wilding

responded by email explaining the economic reasons for basing the royalty on profit and not gross revenue, as well as the rationale for a five (5) percent royalty rate for the contemplated product based on expected costs of goods sold and target pricing. (*See id.* at 2-3.) That same day, Defendant Markeith Boyd replied by email accepting the offer of a five percent (5) royalty on profits and asking for Plaintiff's attorney to draft the contract. (*See id.* at 2.) In that email, Defendant Markeith Boyd stated: "we recognize that you are offering a wonderful opportunity and we couldn't be happier just to see our invention spring to life." (*Id.*)

26.     On April 27, 2018, Mr. Wilding emailed a draft patent license agreement to Defendant Markeith Boyd for his initial review. (*See* Exhibit J.) That draft patent license agreement was for an exclusive license to the '378 Patent in exchange for a $10,000 license fee and a royalty rate of five percent (5%) on gross profits of licensed products. The draft patent license included a definition of gross profits and defined licensed products as any product covered by a claim of the '378 Patent.

27.     On April 30, 2018, Defendant Markeith Boyd emailed an edited version of the draft license agreement including changes by Defendant Markeith Boyd and his attorney. (*See* Ex. J at 1.) In that email, Defendant Markeith Boyd stated regarding changes made by his attorney: "I do not agree with the provision of a "non-exclusive" agreement, as we've already agreed that your license will be "exclusive," please refer to section 2, Licence [*sic*]. Other than that, the revised agreement looks okay to us and we are prepared to sign it forthwith." (*Id.*) Defendant Markeith Boyd also stated that "no lawyers will be needed at this juncture, as I'm quite certain that both attorneys have done a phenomenal job at drafting the initial contractual agreements." (*Id.*)

28.     On or about May 7, 2018, Mr. Wilding and Defendant Markeith Boyd held a

telephone negotiation during which Mr. Wilding objected to changes requested in the draft

patent license and Defendant Markeith Boyd agreed that Mr. Wilding could ignore the changes.

On May 7, 2018 Mr. Wilding emailed to Defendant Markeith Boyd a final version of the license

agreement that included minor changes and rejected 8 changes requested by Defendant Markeith

Boyd.

29.    As documented in Exhibits I and J, the terms of the License Agreement were

extensively negotiated personally between Defendant Markeith Boyd and Mr. Wilding over the

course of ten days.  The emails exchanged between Defendant Markeith Boyd and Mr. Wilding

in Exhibits I and J show that the negotiations were friendly and positive, and did not reflect any

hesitation or misunderstanding on the part of the Individual Defendants regarding the terms of

the license agreement.

30.    The License Agreement was signed by Defendant Bobbie Thompson on May 7,

2018, by Defendants Markeith Boyd and Shirley Lorraine Boyd on May 10, 2018, and mailed

to Mr. Wilding who signed the same document on May 25, 2018.  (*See* Ex. A at 8.)  Plaintiff's

patent counsel received the signed original of the License Agreement by mail on June 6, 2018

and emailed a PDF copy to Defendants' patent counsel that same day.

31.    On June 15, 2018, Plaintiff completed an electronic funds transfer of $10,000 to

Defendants' patent counsel.  (*See* Exhibit K.)  On June 25, 2018, Defendant Markeith Boyd sent

an email to Mr. Wilding stating that the Plaintiff payment had arrived and was being distributed.

(*See id.*)

## KEY TERMS OF THE LICENSE AGREEMENT

32.    Paragraph 2(a) of the License Agreement grants to Plaintiff "a U.S. exclusive,

royalty-bearing license to make, have made, use, sell, offer for sale, or import Licensed Products

in the Field of Use for the Term of this Agreement." (*See* Ex. A at. 1.)  The Field of Use is defined in paragraph 1(b) as "vehicle security systems." (*See id.*)

33.     Section 3 of the License Agreement specifies the license fee and royalties. (*See* Ex. A at 3.)  Paragraph 3(a) requires payment of a non-refundable License Fee of $10,000. Paragraph 3(b) requires payment of a five percent (5%) royalty of the Gross Profit on Licensed Products, with no royalties due on products manufactured and used for development, testing, marketing, demonstrations and other non-revenue purposes or uses.  Paragraph 3(c) states that there are no minimum royalties due under the License Agreement.  Gross Profit is defined in paragraph 1(c) as "gross receipts on sales minus costs of manufacture of sales on all licensed products and an allowance to be made for returns and repairs."  License Products is defined in paragraph 1(d) as: "any product within the Field of Use the manufacture, use, importation, offer for sale or sale of which would infringe a Valid Claim absent the license set forth in Section 2," which necessarily excludes products that are both made and sold outside the U.S. as the '378 Patent is enforceable only within the territory of the U.S.

34.     Paragraph 4(b) of the License Agreement states that "Licensee shall inform Licensors promptly in writing of any alleged infringement by anyone of the Licensed Patent and shall provide any evidence indicating such infringement."  This paragraph grants Licensors "the exclusive right but not the obligation to prosecute all infringements of the Licensed Patent at their own expense," providing that "Licensors shall retain, and Licensee shall have no claim to, any damages received from such litigation related to the Licensed Patent." (*See* Ex. A at 2.)

35.     Paragraph 6(b) grants Plaintiff the right to terminate the License Agreement upon written notice at any time for any reason, with any royalties not already paid on Licensed Products due and payable. (*See* Ex. A at 4.)

36.     Paragraph 6(c) states that either Party may terminate the License Agreement under two conditions.  First, either Party may terminate the License Agreement "in the event of a default by the other Party of any material obligation in this Agreement, effective thirty (30) days after written notice of such default is received by the Party in default and provided that the Party in default has not remedied the default during such thirty (30) day notice period to the non-breaching Party's reasonable satisfaction."  Second, either Party may terminate the License Agreement "immediately upon written notice" if the other Party goes out of business or bankrupt. (*See* Ex. A at. 4.)

37.     Paragraph 7(a) states: "Licensors represents and warrants that Licensors (i) own and hold, free and clear of all liens or encumbrances of any kind whatsoever, all right, title and interest in the Licensed Patent, (ii) have the exclusive right to license the Licensed Patent, and (iii) have the exclusive right to bring action for the infringement of the Licensed Patent." (*See* Ex. A at 4.)

38.     Paragraph 10(a) states that the License Agreement "shall be governed by the laws of the State of New York without giving effect to the conflict of law principles thereof." (*See* Ex. A at 6.)

39.     Section 11 specifies procedures for addressing disputes. (*See* Ex. A at  6.) Paragraph 11(a) states: "The Parties agree to attempt in good faith to resolve all disputes arising out of or in connection with this Agreement by negotiation.  A Party may provide written notice of the dispute to the other Party, following which each Party shall escalate the dispute to the appropriate senior executive management level (for example, President or Chief Executive Officer) within the parties' organization to resolve such dispute within fifteen (15) days of such escalation.  If the dispute is not resolved to the satisfaction of both Parties within thirty (30) days

from the date of delivery of the original notice of dispute, either Party may institute formal dispute resolution proceedings." (*Id.*)  Paragraph 11(b) specifies the jurisdiction for resolving disputes quoted in paragraph 13 above.  Paragraph 11(b) also states:  "The Court shall award reasonable attorneys' fees and costs associated therewith to the prevailing Party(ies) to the extent determined by the Court to have prevailed."

40.     Paragraph 13(b) specifies permissions and restrictions on assignment of the License Agreement, concluding that the License Agreement "shall inure to the benefit of and be binding upon the Parties hereto and their successors in interest and permitted assigns."  (*See* Ex. A at 7.)

41.     The License Agreement does not include any mention or contemplate any obligations of Plaintiff to provide product development status reports, does not specify a product development schedule, and does not require Plaintiff to provide Defendants with any information regarding licensed product designs, suppliers or marketing.  The only material obligations in the License Agreement are to pay five percent (5%) royalties based on Gross Profits of License Products.

## COMMUNICATIONS BETWEEN PLAINTIFF AND DEFENDANTS AFTER EXECUTION OF THE LICENSE AGREEMENT AND PRIOR TO THE NOTICE

42.     Following execution of the License Agreement, there were numerous and regular communications between Defendant Markeith Boyd for Defendants and Mr. Wilding for Plaintiff.

43.     In his June 25, 2018 email acknowledging receipt of the license fee, Defendant Markeith Boyd asked for "more information regarding how you envision our involvement in this project and in what capacity you would like us to operate."  (*See* Ex. K.)  In that email, Defendant Markeith Boyd asked for a tentative schedule for product development and beta

testing, and "have you sourced all the components and identified the hardware and software developers, etc.? With regard to television commercials can we appear (even if only a cameo) in any of them?" (*Id.*) Mr. Wilding replied by email that same day, June 25, 2018, promising to involve Defendant Markeith Boyd in the project, mentioning that he had booked and paid for a booth at the SEMA show in Las Vegas. (*Id.*) Mr. Wilding also stated that required components had been sourced but only as a first stage and requiring testing. (*Id.*)

44.     On August 1, 2018, Defendant Markeith Boyd emailed Mr. Wilding "to inquire about your progress, and to ask if you've developed any marketing literature or brochures." (*See* Exhibit L.) In response, on August 6, 2018, Mr. Wilding emailed to Defendant Markeith Boyd a link to a video on the envisioned product that Mr. Wilding indicated was aimed at investors, not the public. (*See* Exhibit M at 2.)

45.     On September 6, 2018, Defendant Markeith Boyd emailed Mr. Wilding stating: "we are expecting to attend the SEMA Show and wish to learn more about the process and what's required. Will you have dedicated Sales Representatives on site to present our products, or, do you anticipate us being responsible for this task? Either way, we want to be there." (Ex. M at 1-2.) On September 9, 2018, Defendant Markeith Boyd again emailed Mr. Wilding about the SEMA Auto Show. (*See* Exhibit N at. 2-3.) Mr. Wilding replied that same day, reporting that they had a few delays in development but they were progressing, and that funds were in place to complete trials and a first production run. (*See id.* at 2.) Mr. Wilding also stated: "Not sure just yet if we will have something to show at SEMA but workings on it."

46.     On September 26, 2018, Defendant Markeith Boyd emailed Mr. Wilding, asking similar questions regarding recent developments, the SEMA show and marketing materials. (*See* Ex. N at 1-2.) Mr. Wilding immediately responded by email, saying: "Bad news I'm afraid,

I'll had to pull the plug on SEMA as we will simply not have anything professional enough to show by then, and I do not want to divert resources to getting something to show when we should concentrate on producing the best product we can first time. There will be lots of show to go to next year, so rest assured travel is in your future." That email stated that he hoped "to have something ready for testing in January." (*See id.*)  That email also explained that "we have found a company who are developing a similar product, all be it in the high end price bracket. I have made them aware of your patent and our licence, (I'm sure their research pick[ed] it up but hoped to produce under the radar (so to speak). Well they are now aware we know of the project and will not allow anything to come to market without our approval, and the only way to get approval is to pay us a licence to copy our licence." That same day, September 26, 2018, Defendant Markeith Boyd replied by email: "Thanks for the update, and for the information about our potential new licensing prospects. We agree with you completely -- it's best to focus on designing and developing the best possible product, rather than diverting our resources into an area that we simply are not ready for." (*Id.* at 1.)

47.     On September 27, 2018, Defendant Markeith Boyd sent an email to Mr. Wilding again agreeing with focusing on development of a superior product. (*See* Exhibit O at 4.)  That email asked a series of detailed questions about the company mentioned by Mr. Wilding in his September 26, 2018 email. (*See id.*)  Mr. Wilding responded on September 29, 2018, saying that the company had not launched a product yet, so technically there was no infringement or annual turnover. (*See id.*, 3-4.)

48.     On September 29, 2018, Defendant Markeith Boyd sent an email to Mr. Wilding, repeating requests for detailed information on the company, stating the basis for the requests comes from Section 4(b) of the License Agreement.  On October 3, 2018, Mr. Wilding replied

by email, explaining:

> Let me set this out correctly for you. I have information about a product that looked like it might infringe on your patent, however at this stage we have no evidence they will upgrade there[sic] system to an infringing product. As and when we have clear evidence of this we will indeed under our licence agreement contact you with there[sic] details. At this stage there is no evidence, and my lawyers have written to this company informing them of our concerns and offering to licence our patent to them should they decide to upgrade to a video product. I do not wish to sound offish for not giving you details at this point, however I would rather wait to see if they decide to build an upgrade that will infringe.

(Ex. O at 2.)

49.    That same day, October 3, 2018, Defendant Markeith Boyd replied, stating among other things: "Understandably, the company that you have identified as a potential infringer has NOT yet violated our patent, and thus, you are under NO obligation to disclose any information regarding this organization." (Ex. O at 2). Defendant Markeith Boyd also asked for Mr. Wilding's telephone number. (*See id.*) Mr. Wilding responded immediately, providing his home telephone number and stating:  "Please rest assured your family is my family when I do business with individuals. I very much look Forwading[*sic*] to discussing the business with you, but I have learn from past experience not to run before I can walk, so in turn I do not like to discuss the future of a product till I have completed the project and we have a working system we can sell. It's far to[*sic*] easy to get ahead of ourselves and only to leave everyone let down, that's not the way I work, I focus on the goal at hand, then move on to the next till the project is complete. Whilst we are testing in the field that is when all kinds of discussions can take place with yourselves and customers." (*Id.* at 1-2.) Defendant Markeith Boyd replied by email saying "We agree with you totally!" (*Id.* at 1.)

50.    On November 28, 2018, Defendant Markeith Boyd emailed Mr. Wilding, inquiring about the status of the product development. (Exhibit P, at 1-2.) Mr. Wilding replied

that same day, stating: "I am due to Fly to Scotland on Friday to see the completed Mechanical, I hope to see a mockup of the product.  Sadly we are 8 weeks behind our original schedule, but we are working our way forward.  During my visit I am visiting the factory who will produce the first run." (*See* Ex. P at 1.)  Defendant Markeith Boyd replied the same day saying: "That's encouraging news.  Thanks a bunch, and please continue to keep us posted." (*Id.*)

51.     On December 5, 2018, Defendant Markeith Boyd emailed Mr. Wilding to report that they had identified two possible infringers and decided to pursue an infringement case against them, and instructed their attorneys to send the initial Cease and Desist letter.  (Exhibit Q at 3.)  Mr. Wilding immediately replied by email, expressing surprise to hear about the two identified infringers, stating, "I am aware that [COMPANY X][1] is now selling," and asking about the two identified infringers. (*Id.* at 2.)  Mr. Wilding's email also provided a status update on the product development effort based on his trip to Scotland. (*Id.* at 3.)  Defendant Markeith Boyd replied by email the same day, identifying the two identified companies against which actions were being taken (neither of which was COMPANY X), and inviting Mr. Wilding to call him at Mr. Wilding's convenience. (*Id.* at 2.)

52.     On December 10, 2018, Mr. Wilding emailed Defendant Markeith Boyd, commenting on the two identified companies.  Mr. Wilding's email also stated: "[COMPANY X] are selling so you might as well pick upon that one too if you want too." (*See* Ex. Q at 2.) That email also requested a time to have a telephone call per Defendant Markeith Boyd's request. (*Id.*)  Defendant Markeith Boyd replied by email that same day, proposing a time for the call.

53.     On January 15, 2019, Defendant Markeith Boyd emailed Mr. Wilding requesting

---

[1] "COMPANY X" is not identified as it is an uninvolved third party.

an update, asking: "Any new developments or progress?  Please advise." (Exhibit R at 2.)  Mr.
Wilding replied immediately by email explaining he was going to call at the end of the year but
had not received an email reply from Defendant Markeith Boyd with his time zone.  (*Id*.)  Mr.
Wilding's email also provided a status update, stating:  "Things are progressing well if not
slowly.  We should have our prototypes finished by the end of February, when I have some final
designs I will forward them to you." (*Id*.)  Defendant Markeith Boyd replied by email that same
day, stating: "Thanks for the update!  Just keep us in the loop.  I'll follow up in another month
or so."  (*Id*. at 1.)

54.     On January 15, 2019, Mr. Wilding also sent an email to Defendant Markeith
Boyd, asking: "how you have got on with companies using your patent as I asked in my last
email?" (*See* Ex. R at 1.)  Defendant Markeith Boyd replied on January 16, 2019 explaining
that Cease and Desist letters had been sent out, and that the legal team was preparing claim
charts.  (*Id*.)  Defendant Markeith Boyd's email also asked for the name of the company that
Mr. Wilding had communicated with.  Mr. Wilding replied immediately by email saying:  "I do
believe I did give you this but here it is again, everything you need to know is on this website:
[COMPANY X].com   That good to hear Markeith, keep on top of them all."  (Ex. Q at 1.)
Defendant Markeith Boyd replied immediately by email, saying only "Got it."  (*Id*.)

55.     The next communication received by Mr. Wilding was an email on February 20,
2019 from Defendants' patent counsel with the subject line "Notice of Termination" that
attached the Notice (Ex. B) and included a one sentence message: "Please see the attached
Notice of Termination of the license agreement with Citadel Alarms."

## NOTICE OF TERMINATION AND SUBSEQUENT COMMUNICATIONS BETWEEN PLAINTIFF AND DEFENDANTS

56.     The Notice purports to provide notice of termination of the License Agreement

effective February 16, 2019 due to default of a material obligation. (*See* Ex. B at 1.)
Specifically, the Notice alleges that Plaintiff "repeatedly failed to 'inform Licensors promptly
in writing of any alleged infringement' by [COMPANY X] of the licenced[*sic*] patent, despite
Licensor's repeated requests." (*Id.*) The Notice quotes email exchanges summarized in
paragraphs 39-44 as substantiation for the allegations. (*See Id.* at 1-2.) Finally, the Notice
concludes:  "Pursuant to Section 6(c) of the License Agreement, Licensors hereby place
Licensee on Notice of License Agreement Termination.  Licensee has thirty (30) days after
receipt of this notice of such default to remedy the breach to Licensors' satisfaction." (*Id.* at 2.)

57.     Upon receiving the Notice on February 20, 2019, Plaintiff had its patent counsel
attempt to call Defendants' patent counsel.  Plaintiff's patent counsel left four voice mail
requests for a return call.  Defendants' patent counsel did not call (and has not called) Plaintiff's
patent counsel.

58.     Receiving no response from the repeated phone calls, Plaintiff's patent counsel
prepared and emailed to Defendants' patent counsel the Response. (Ex. C.)  The Response
objected to the Notice for failing to state valid grounds for termination because, as admitted in
the Notice, "at no time has my client alleged that [COMPANY X] infringes" the '378 Patent, and
"Mr. Wilding explained that to your client, Defendant Markeith Boyd, last year." (*Id. at* 1.)  The
Response further explained that Plaintiff's patent counsel had "carefully reviewed the facts
available to us after reasonable due diligence (including studying their website, viewing videos
of the product in use and patent searches) and concluded that [COMPANY X] failed to satisfy a
key limitation of the independent claims of the '378 patent.  Based on my analysis of the
[COMPANY X] product, it was and remains my legal conclusion that [COMPANY X] did not
infringe the '378 patent in 2018. . . Accordingly, Mr. Wilding did not make any such

infringement allegation, instead writing COMPANY X to propose a sub-license if they want to upgrade their product to add the feature of the '378 patent missing from their current product. It was this potential for a future sublicense that Mr. Wilding discussed with your client. Accordingly, Griffin Security has had and continues to have no basis for an allegation of infringement. Thus, there has never been an obligation to report an allegation of infringement." (*Id.*) The Response explained that "there is a significant legal difference between (i) identifying a company that might one day desire a sublicense for an upgraded product and (ii) finding evidence of infringement rising to the level of an "allegation of infringement" under paragraph 4(b) of the Agreement." (*Id.* at 1-2.) The Response concluded by requesting a call to schedule a negotiation telephone call between Defendant Markeith Boyd and Mr. Wilding as specified in the dispute resolution procedure specified in paragraph 11(a) of the License Agreement.

59.     On February 27, 2019, Plaintiff's patent counsel received a call from Defendants' litigation counsel during which the dispute was discussed and agreement was reached to schedule a telephone call to negotiate the dispute in accordance with the dispute resolution procedure specified in paragraph 11(a) of the License Agreement.  Following this call, Plaintiff's patent counsel emailed to Defendants' litigation counsel a copy of the letter sent to COMPANY X (Ex. R) that had been mentioned in Mr. Wilding emails and in the Response, and a video showing lab testing of a prototype of the product under development by Plaintiff.

60.     On February 28, 2019, a telephone conference call was held between Defendant Markeith Boyd, Mr. Wilding, Defendants' patent counsel, Defendants' litigation counsel and Plaintiff's patent counsel.   During this call the nature of Defendants' dissatisfaction with Plaintiff was discussed.  The discussion first focused on Plaintiff's failure to identify COMPANY X as an infringing product despite requests for detailed information.  Plaintiff's patent counsel

explained that it was and remains his legal opinion that COMPANY X does not infringe the '378 Patent, a position that Plaintiff accepted, and the reason why no formal written disclosure of an alleged infringement was made by Plaintiff.  Defendant Markeith Boyd stated that Defendants had determined that COMPANY X was infringing since early in 2018.  The discussion then turned to Defendant Markeith Boyd's dissatisfaction with the amount and frequency of information provided by Mr. Wilding related to the product development.   Mr. Wilding explained that a wire board prototype was in testing, that an "alpha product" was expected in May followed by extensive field test leading to a "beta product" in June, followed by manufacturing starting in August and initial sales efforts in September.  Mr. Wilding also offered numerous apologies stating he was under the impression from the frequent emails that he had provided sufficient status updates given the nature of the development work underway. Defendant Markeith Boyd expressed dissatisfaction with this information, requesting details on product design, component costs, development contractors, contract manufacturers and distributors.  Defendants' litigation counsel then suggested as a way to resolve the dispute that Defendant Markeith Boyd, through his attorneys, would provide a list of requested information and documents to Plaintiff's patent counsel within three days, and that Plaintiff would then have five days to respond with the requested information.  Mr. Wilding accepted this offer to provide more information regarding development and manufacturing of a licensed product.  There was no other agreement reached, and no mention of or agreement to amend or replace the License Agreement.

61.    On March 18, 2019, Plaintiff's patent counsel received an email from Defendants' patent counsel providing a document entitled: "License Agreement" (Ex. D). Defendants' patent counsel's email stated: "Attached please find a new licensing agreement

between our clients. It was cleaner to draft this agreement from scratch, rather than amend the former agreement.  You will see the list of Citadel's requested information incorporated in this agreement."

62.     In addition to not agreeing to amend or replace the License Agreement, there are several terms in the proposed new license agreement that are unacceptable to Plaintiff, are business unreasonable, or incongruent with a patent license.  For example, the proposed new license offers a non-exclusive license instead of the exclusive license granted under the License Agreement. (*See* Ex. D at 2.)  The proposed new license requires an advance payment of a non-refundable two-hundred fifty thousand dollar ($250,000) advance on royalties and requires Plaintiff to pay further advances against future royalties upon request.  (*Id.*)  The proposed new license sets a royalty rate of nine percent (9%) on gross revenues instead of gross profits as specified in the License Agreement.  (*Id.* at 1-2.)  The proposed new license requires weekly email progress reports on research, development, implementation and production of the product, and then weekly sales reports and sales forecasts.  (*Id.* at 3.)  The proposed new license requires production of information that is proprietary to Plaintiff and inconsistent with a patent license. (*See, e.g., id.* at 4-5.)  The proposed new license grants Citadel the right to terminate the agreement at any time for any reason whatsoever.  (*Id.* at 7.)  The new license requires Plaintiff to vigorously defend at its own expense any invalidity actions brought against the patent rights. (*Id.*)  The new license requires Plaintiff to bring infringement actions at its own expense without permitting Plaintiff to receive damages collected in such actions.  (*Id.*)

63.     On March 28, 2019, Plaintiff's patent counsel emailed the Defendants' patent counsel a proposed Side Agreement (Ex. E).  The proposed Side Agreement reflects the agreement reached during the February 28, 2019 negotiation telephone call between the parties

and does not constitute an amendment or replacement of the License Agreement.  In particular, the proposed Side Agreement lists documents and information that Plaintiff is willing to produce to Defendants regarding development of a Licensed Product.  Plaintiff's patent counsel's email also stated: "Griffen Security will not agree to replace or amend the license contract that currently exists between the parties."

64.    On April 1, 2019, Defendants' patent counsel sent an email to Plaintiff's patent counsel, stating:  "We received your side agreement draft between Plaintiff Security and Citadel's patentees and regret to inform you that our client cannot accept or agree to your agreement.  We ask you to reconsider the License Agreement that was offered, which we believe provides a mutually beneficial resolution, without beginning prolonged and expensive federal litigation. If that is not acceptable, then the standstill agreement would no longer be tolled. Our previous notice that the original License Agreement is null and void would apply from today's date and trigger the process set forth in the license. We look forward to hearing from you."

## PLAINTIFF'S DEVELOPMENT OF A PRODUCT RELYING ON THE LICENSE AGREEMENT

65.    After entering into the License Agreement, Plaintiff initiated development of a product consistent with the claims of the '378 Patent.  To date, Plaintiff has expended significant effort, entered into contracts with a number of companies, spent over $168,000 so far, and has executed contracts requiring the expenditure of another $42,000 in development of this product. Further costs will soon be incurred by Plaintiff as the product enters preproduction testing, manufacturing and then sales.  The product is now in initial testing, with plans in place to move to production in August 2019 to support initiating sales in September 2019.

66.    Plaintiff has relied on the License Agreement by developing a product consistent with the claims of the '378 Patent, and therefore will infringe at least one claim of that patent

unless redesigned (or a different product is developed) to avoid infringement.  By entering into the License Agreement, Defendants lured Plaintiff into investing in the development of an infringing product and thus denied Plaintiff the fair opportunity to develop a product that would not infringe the '378 Patent.  If Defendants are permitted to terminate the License Agreement, Plaintiff will incur a lose of the $200,000 or more already invested in an infringing product, and Plaintiff will be forced to either incur similar costs to develop a non-infringing product or abandon the economic opportunity of the new product for which Plaintiff bargained for when negotiating and paying for the License Agreement.  These losses and additional costs would exceed $75,000.  Further, developing a different product would delay sales of Plaintiff's products by several months, and thus delay Plaintiff's return on investments made in reliance of the License Agreement.

### FIRST CLAIM FOR RELIEF
### Declaratory Judgment – License Agreement Not Terminated

67.     Plaintiff repeats and re-alleges in full the allegations in paragraphs 1 through 66.

68.     An actual and justiciable case or controversy exists between Plaintiff and the Defendants regarding the License Agreement which arises under the Patent Laws of the United States.

69.     The Notice from Defendants, through counsel, purports to terminate the License Agreement due to breach of a material obligation of the License Agreement for failing to inform Defendants in writing about an alleged infringement.  However, Plaintiff has not breached the License Agreement, much less materially breached it, because Plaintiff never alleged infringement.  Defendants admitted that if there is no infringement, then there is no duty to report an alleged infringement.   (*See* Ex. O at 2.)  Moreover, the purported breach alleged by the Defendants was effectively cured by subsequent written communications from Plaintiff to the

Defendants.  (*See, e.g.*, Ex. C; Ex. Q at 2.)  As such, Defendants had no right to terminate the License Agreement, and the Notice is invalid.

70.     Plaintiff is entitled to a judgment declaring that Defendants (a) were not entitled to terminate the License Agreement, (b) the purported termination of the License Agreement is null and void, and (c) that the License Agreement is still valid and binding as to Plaintiff and Defendants, and therefore (d) any products developed by Plaintiff in reliance on the License Agreement do not infringe the '378 Patent by means of the license granted by Defendants.

## SECOND CLAIM FOR RELIEF
### Breach of the License Agreement

71.     Plaintiff repeats and re-alleges in full the allegations in paragraphs 1 through 66.

72.     Plaintiff and Defendants are the parties to the License Agreement.

73.     Paragraph 2(a) of the License Agreement (Ex. A at 1.) grants an exclusive license to the '378 Patent, and thus was intended to grant Plaintiff the economic benefit of developing and selling products protected by the limited monopoly of the '378 Patent in return for sharing with Defendants a percentage of such economic gain in the form of royalties on gross profits of Licensed Products.

74.     Defendants have received the economic benefit of the License Agreement for which they bargained in the form of the $10,000 up-front License Fee, and will continue to receive the economic benefit of royalties on Licensed Products once such products go on sale later this year.

75.     Plaintiff has relied on the License Agreement by investing in the design, development and testing of a Licensed Product (instead of a product not covered by the '378 Patent), but has yet to receive the benefit of the License Agreement or a return on this investment

as sales of licensed products are scheduled for later this year.

76.     Paragraph 6(c) License Agreement permits termination by the Defendants based only on a material breach that is not remedied.

77.     On October 3, 2018, Plaintiff (Mr. Wilding) explained in writing to Defendants (Defendant Markeith Boyd) that Plaintiff sent an invitation to a potential sublicensee (COMPANY X), but that Plaintiff did not have evidence that the company infringed the '378 Patent, and Defendant Markeith Boyd acknowledged this and expressly agreed that "the company that you have identified as a potential infringer has NOT yet violated our patent, and thus, you are under NO obligation to disclose any information regarding this organization." (*See* Ex. O at 2.)

78.     The Response to the Notice explained in detail why Plaintiff did not and was under no obligation to disclose in writing an alleged infringer because diligent investigation revealed no infringement, and therefore there was no breach of the License Agreement by Plaintiff.

79.     At all times relevant hereto, Plaintiff has fully performed and remains willing to perform all duties and obligations required by the License Agreement.  Further, Plaintiff has worked diligently and invested significant sums to develop a Licensed Product on which royalties will be due to Defendants once it is on sale if the License Agreement is not terminated.

80.     Even if the delay by Plaintiff in identifying COMPANY X to Defendants could be construed as a material breach of the License Agreement, Plaintiff cured such breach by providing all information available to Plaintiff (specifically the website address that Plaintiff patent counsel examined in determining no infringement) by an email sent on January 16, 2019. (Ex. Q at. 1.) Even if that communication is not sufficient to cure the alleged breach, the

Response to the Notice on February 20, 2019, explaining in detail why there had been no written notice of an alleged infringement, provided a reasonable cure for such breach.

81.     Defendants' Notice and April 1, 2019 email initiating termination of the License Agreement without a valid basis constitutes Defendants' material, anticipatory breach of the License Agreement.

82.     Defendants' refusal to consider any of Plaintiff's actions to cure the alleged material breach is unreasonable, and therefore also constitutes Defendants' material, anticipatory breach of the License Agreement.

83.     Defendants' breach of the License Agreement is intentional, willful, deliberate, in bad faith, and undertaken with full knowledge that Defendants have no right or authority to terminate the License Agreement and that it would cause substantial damage to Plaintiff.

84.     Plaintiff is entitled to specific performance by Defendants under the License Agreement.

85.     If Defendants are permitted to terminate the License Agreement, Plaintiff will incur losses of at least $200,000 in expended and committed investments made in reliance on the license granted under the agreement, and therefore Plaintiff is entitled to damages in an amount to be determined but not less than $200,000.

86.     Plaintiff is further entitled to Plaintiff's costs and attorneys' fees as provided in paragraph 11(b) of the License Agreement.

### THIRD CLAIM FOR RELIEF
### Breach of Implied Covenant of Good Faith and Fair Dealing Under the License Agreement

87.     Plaintiff repeats and re-alleges in full the allegations in paragraphs 1 through 66.

88.     Defendants and Plaintiff are parties to the License Agreement.

89.     Defendants have breached the implied covenant of good faith and fair dealing in the License Agreement by attempting to terminate the agreement without cause and intentionally and willfully refusing to accept any written communications by Plaintiff regarding COMPANY X as a reasonably acceptable cure to the alleged breach of not disclosing an alleged infringement. Defendants' actions, if not blocked by this Court, will deny Plaintiff the intended economic benefits of the License Agreement after Defendants have received the License Fee.

90.     Plaintiff is entitled to specific performance by Defendants to comply with their obligations under the License Agreement, as well as Plaintiff's costs and attorneys' fees in accordance with the License Agreement.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

a.      For declaratory judgment that Plaintiff has not breached the License Agreement, or in the alternative that Plaintiff has cured the alleged breach of the License Agreement;

b.      For declaratory judgment that products developed by Plaintiff in reliance upon the License Agreement shall not infringe the '378 Patent because of the license granted.

c.      For an order of specific performance by Defendants pursuant to the License Agreement;

d.      In the alternative, for damages resulting from Defendants' breach of contract in an amount to be determined but not less than $200,000.

e.      For attorneys' fees and costs incurred by Plaintiff in this action; and

f.      For such other and further relief as the Court deems just and proper.

Dated: April 19, 2019                    Respectfully submitted,

                                         _____
                                         Jacqueline I. Meyer
                                         JMeyer@hodgsonruss.com
                                         Hodgson Russ LLP
                                         605 Third Ave, Suite 2300
                                         New York, NY 10158
                                         (646) 218-7633 (tel.)
                                         (646) 943-7083 (fax)

                                         Shauna Wertheim (*pro hac vice* pending)
                                         swertheim@marburylaw.com
                                         Robert M. Hansen (pro hac vice pending)
                                         rhansen@marburylaw.com
                                         The Marbury Law Group, PLLC
                                         11800 Sunrise Valley Drive, 15th Floor
                                         Reston, VA 20191
                                         (703) 391-2900 (tel.)
                                         (703) 391-7100 (fax)

                                         *Attorneys for Plaintiff Griffen Security, LLC*